I would like to reserve three minutes for rebuttal if I may. The main issue on appeal, I believe, is the scope of this conflict of interest law, 18 U.S.C. 208, and the extent to which it applies to, in this case, to participation in post-contractual implementation activities involving an outside vendor in which the defendant had potentially been involved in. of interest by virtue of her husband's employment with that vendor. During the relevant time, defendant worked at Bonneville Power Administration on a special detail tasked with implementing various I.T. projects within the transmission marketing arm of the transmission side of BPA. Mr. Olson, we've read your brief. You have a pretty good feel for Ms. Selby's job at the BPA. If you could address for me, why should we analyze conflict of interest law under Section 208 any differently than we understand it as lawyers and judges when we have to recuse ourselves from matters where it is suggested that we may have a conflict of interest? Isn't that what Congress had in mind when it enacted the prohibition, making it a criminal offense for a federal employee who suffered from a conflict of interest to have any contact at all with the matter which created the conflict? There's no question that Congress enacted this version of the conflict of interest law intended to broaden the scope, make it more clear in a lot of ways, and make it more consistent because there were a number of different statutes that applied to different agencies and there were some inconsistencies there. So there was some effort to unify and to codify all these different standards. Now, I can't speak specifically to the conflict of interest regulations that the court is under, but there is a legislative history to this act. And what's unique about this particular case, Your Honor, in this particular scenario is that this was a situation where Ms. Selby, at the time of her husband's employment, there had already been a decision to let this contract or to go forward with this pilot project involving this business. Didn't they have to make another decision about whether to proceed with hourly scheduling? I'm sorry, Your Honor? Didn't there come a point in time where they had to make a decision about whether to have hourly scheduling as part of the service provided by Nomadic? Yes, Your Honor. And didn't she actually advocate going forward with this to her superiors? Wasn't there a meeting which she advocated going forward with this program, notwithstanding opposition within her own agency? Your Honor, she did. And viewing the evidence in the light most favorable to the government, she did voice the opinion that this ASCII product should involve the use of this hourly component. But what the statute requires is that she participate substantially. Well, you've got a hard time with the statute that isn't, by its terms, limited. I mean, the real question is, can you do something post-procurement to favor a vendor? I think the obvious practical answer is yes. So what is it about the statute that says, but we're not going to, as a statutory matter, cover that with this statute? And let me just say, Your Honor, I don't think I can make the argument that post-contractual implementation activities could ever be covered under the statute. Well, in fact, it was a new procurement, was it not? Well, at that point in time, no. But the decision that Judge Corman was asking you about to, in essence, turn on or whatever it is, the hourly electrical scheduling software, involved the additional expenditure of BPA monies to the vendor and, in essence, expanded the scope of the procurement. Well, that, arguably, yes. But Ms. For which a commission got generated that was ultimately paid to her husband. Well, actually, there's two responses to that. Number one, there was no evidence that Ms. Selby even knew about that aspect of it. That her husband was going to get a commission at the business to his employer Avery. There was no evidence that she knew that this decision about hourly or turning on the hourly would lead to any further procurements. Her understanding was that Bonneville had already purchased a number of licenses for this purpose, for this scheduling tool. This is her testimony. Her testimony? I mean, how might it view that in the light of the jury's verdict, which convicted her of the conflict of interest offense? Well, I don't recall any. Do you assume that the jury didn't believe her when she said she didn't know? Well, I. Viewing the evidence in the light most favorable to support the verdict? And I'm sure they'll point it out to me in a moment here, but I don't recall any evidence directly on point suggesting that she knew that this decision. What I'm suggesting is if I apply the standard, which I think I must on appeal, of viewing all the evidence in the light most favorable to support the jury's decision, the jury has to make a credibility decision as to whether or not to believe anything the defendant said. And the government doesn't have to show anything beyond the fact that the jury convicted in order for an appellate court to conclude that the jury must not have believed the defendant's version of what happened. Have I got it wrong? Well, the way this case was played out, and I think the evidence that the jury heard, I don't know that they necessarily made a determination that she must have known that by turning on this hourly component, she knew that her husband was going to receive some money. But the problem you've got is then you've got these post-procurement actions involving, I'll call up the supplemental transcript of interest form, and the dispute over whether she backdated the dates of her husband's employment in order to make it look like he hadn't been working for the company as long as he had. Well, and that, on that issue. The invoices were sent to BPA to pay Nomadic, which included money that he was going to get a commission for. I mean, if you look at all that evidence. Which, again, she had nothing to do with invoices, for example. And she certainly had something to do with the form that she was accused of falsifying the dates on. Now, I understand she has an explanation for, you know, a misrecollection or error in the date. Right. And the form, you know, the error that she made on that form with regard to the date of her husband's employment. This was now almost a year, well, several months after the husband had left and almost a year since he had began his employment. The issue with regard to that form, that second recusal letter that she signed, was what were her activities going forward now with respect to being involved in the Nomadic dispute that had arisen and with regard to additional Nomadic work. But the charge is conflict of interest. You don't dispute that the husband got a commission for that business. The dates were relevant on the form that she filled out as to when her husband worked for Nomadic. That was information that presumably the agency looked at when she circulated the form at a time when they were considering the dispute over the unpaid vouchers from Nomadic. I just don't see how you parse it out the way you're asking us to do when I've got to look at the entire record before the jury to decide whether or not this evidence is sufficient to amount to a culpable conflict of interest under Section 2.1. Well, let me back up for a second. The second recusal letter is addressed in, I mean, it's very germane obviously to one of the counts because one of the counts was making a false statement. And I understand it's also included within the government's theory of wire fraud and conflict of interest. The conflict of interest statute itself asks the question, what was the defendant's participation with regard to a particular proceeding that was then in play, whether it be a contract or a dispute? So we've gotten to the point where you agree that she participated in this decision on hourly scheduling. She advocated for it. Your argument there is you say she didn't know it would benefit her husband. What about the e-mail that she sent to her husband? Well, yes. And she forwarded to him. I mean, why would she be telling him about this decision of all? I mean, she's basically telling him, look, we're going to go forward. In effect, the e-mail was saying we're going to go forward with hourly scheduling. Why did she think she had to forward that e-mail to him? She must have understood, I mean, a jury could certainly conclude that she must have understood that there was some advantage, financial advantage to him as a result of this transaction. Well, I don't know that that necessarily follows that she therefore knew that he was going to proceed. Well, I'm talking about when, you know, your brief is written in a way that doesn't, I don't blame you, but your brief is written in a way that ignores the standard of review here. That is, you have to, you know, you talk about what she said as if somehow that makes it so. We're talking about drawing all of the inferences from the evidence and the like most favorable to the government. And why can't the jury, why isn't it an inference? Why was she forwarding him an e-mail telling him about the decision to go forward on this hourly scheduling unless she knew that he was interested in it, not just out of curiosity, but because he had a financial interest in it? Let me just say, Your Honor, I'm aware that, you know, there is the standard that we have to construe the evidence most favorable in light of the government on this issue of the e-mail. And, you know, Mark Reynolds, in all fairness, testified that he thought it was inappropriate that she send this e-mail and that he believed that it contained information that shouldn't have been disclosed to the husband. But in the same breath, or in virtually the same page in the transcript, he acknowledged that this was information that... Remember, that goes to the separate issue of whether it furthered the mail fraud or the wire fraud. What I'm suggesting is the fact that she, after she advocates for this, admittedly she shouldn't have been doing it. And then your issue comes down, well, she didn't know her husband was going to benefit from it. Why doesn't the fact that she thought to send him an e-mail with respect to have that decision having been made, why can't a jury infer that? What is she sending him this e-mail for? She obviously understood that he was interested in the outcome, that he had a financial interest. Well, again, Your Honor, I don't believe that that establishes that knowledge or that understanding. Knowledge can only be established by circumstantial evidence short of a confession. I mean, this is... No, go ahead. No, I understand, Your Honor. And this, I mentioned earlier that I have two responses to this whole issue about the hourly products. The other one is that, you know, there was evidence that she made a recommendation or voiced the opinion at this meeting that they should go forward with hourly products. But that, again, the issue here, at least with respect to the conflict of interest statute, the elements of that, was her participation substantial. And when you look at the full course of events here... Substantial is a word with a kind of an indefinite meaning. What does substantial mean? Well, I think in this... I mean, if you take a look at the definitions of the word substantial, what does it mean? I mean, here she has a significant administrative position to the point where when Myers goes away, she becomes the acting head. And she's obviously a person whose views are going to be relied upon, and she strongly advocates. Why isn't that substantial participation? Well, and she never made a decision in... So she wasn't the ultimate decision-maker, but that doesn't mean anything. My law clerk is not the decision-maker, but when my law clerk advocates, it could affect my decision because I might, to a degree, rely on it. Now, shouldn't if he has a conflict, then he's breached the conflict of interest statute. And with regard to that meeting, I mean, Chuck Myers' testimony was that he understood that this had to go forward because of the amount of money that had been spent. Well, but he may have been mistaken, but that doesn't change the fact that she was a substantial participant in this decision and she was aware and a jury could find that she was aware that it would benefit her husband. There is evidence, as I understand it, that Myers' view was mistaken, that it required a whole, you know, that substantial work was required to make the software compatible and that this was going to cost money. That may be, and my point was just that, you know, Mr. Myers, Chuck Myers was not relying upon any advice that was given by Jane Selby with regard to this hourly thing. But that doesn't matter to me. I mean, at least I don't see it. I mean, she shouldn't be, whether he was relying on it or not, it seems to me that she was participating and giving advice and I think that's substantial participation with knowledge. The fact that the ultimate decision-maker, what he relies on, is unclear. Your Honor, you know, what is unique again about this case is the fact that there had been a decision to go forward with this pilot project. And what was at issue at the time of this hourly discussion was what aspects of this device are we going to turn on and use with our customers. But didn't it cost the agency another $1.75 million or whatever the amount was that her husband was later trying to get a commission? Well, you know, I believe that that did actually occur. But again, in terms of her— Your Honor, I don't see the distinction you're trying to draw, Mr. Olson. The Bonneville Power Administration has a vendor relationship with Nomadic, but that doesn't mean that it's a single contract. I mean, it's basically, if you will, a series of subcontracts that may or may not be entered depending upon decisions that BPA decides to make on what it's going to do with its computer system. So I'm just not sure that your argument is getting you where you need to go on this. Well, and I'll just say that, yes, I mean, there were a number of add-on contracts after the first one that authorized additional expenditure towards completion of this project. And the government has discussed that there was at least a theoretical possibility that this contract or this pilot project could have been canceled at any point in time. So that's to suggest that Ms. Selby's ongoing role, which was her assigned role, in attempting to help implement this project, had some bearing on the government's decision not to stop. But I don't think there was really any point in time where there was a real decision time to say, okay, are we going to stop this contract or not? There was a discussion about... But to go back to the first question I asked you, why don't we apply normal principles of conflict of interest to these facts? It seems to me this is a perfect example of why once you declare that you have a conflict of interest, you've got to get out. You shouldn't have anything to do with the project just to avoid this kind of a question as to whether or not you did have a role in participating in the decision to procure more business from Nomadic and whether or not your participation was substantial. The rules are designed to hopefully separate the employee from the situation. Well, and there is a difference, obviously, between... And again, I haven't looked at all the different conflict of interest laws that are out there. There is a difference between codes of conduct and criminal statutes. And certainly in retrospect, I'm not going to say that as a matter of employee conduct, it was okay for her to be involved in all this. There was the advice that she got from the ethics advisor who testified that she couldn't remember any of this discussion, but she also testified that she had a bad memory and she had problems with recollection. She told her that she could be involved in implementation activities. I know, but you know, this gets to... There's a jury who heard this. They didn't have to believe her testimony. You have constantly in your brief given her testimony as if somehow that's the truth. Well, I don't know that... The jury found her guilty. It resolved all... We have to assume it resolved all issues in favor of the government. Well, I see I'm well into my rebuttal time, but I'll just respond that she testified to certain things about this conversation that she had with the ethics officer. It was not rebutted. And so I view that as something that is fair game to talk about in this appeal. Thank you very much, Mr. Olson. New testimony. May it please the Court. Kelly Zusman appearing on behalf of the United States. I think I want to talk first by answering the Court's question about the scope of Section 208, and that is the language of the statute itself is very, very broad. It refers to employees of the United States who participate personally and substantially through a decision, approval, disapproval, recommendation, rendering of advice, investigation or otherwise, in a contract, claim, controversy, or other particular matter. I think that even the admission we heard today, there's simply no question that Ms. Selby participated both personally and substantially in matters affecting the nomadic contract vis-a-vis BPA. The scope of the statute is entirely consistent with a common sense understanding of what it means to be a federal employee with a conflict. Before I joined the U.S. Attorney's Office, I was a law clerk for a district court judge. And when the U.S. Attorney, Karen Emberg, called me to offer me the job, and I accepted, from that point on, I was immediately disqualified from working on any matter involving the United States. And I didn't. I mean, I was screened off from all of those cases. That's precisely what should have happened here. How did you get involved in this case? It was after. It was after. It was years after. Years later. So, but the point is, what Mrs. Selby was supposed to do, what she was trained to do, she received ethics training. Why they had, why BPA had an ethics officer, was from that point forward, she was supposed to have absolutely nothing to do with a nomadic contract. Well, the problem for her, to be charitable at least, is that her job sort of compelled her to have at least some involvement. I mean, what was her special assignment? She had a number of different job duties. But there was a special assignment she was given that, as I understood it, required her to succeed in transitioning the organization to a new form of technology. That's absolutely. And just like a law clerk is supposed to be working on cases, part of the reason why she received a letter from the ethics advisor was she was supposed to make copies and give it, excuse me, give it to the people that she was working with so that everybody knew, hey, it may seem odd that I'm not working on this one particular contract, but here's why. My husband works there. So I can't have anything to do with it. Don't ask me for advice on what I think about this as opposed to ETMS or anything else. Here's the letter. It may seem weird, but I can't work on that particular contract. So that's why. And that's what she was supposed to be doing. But I think, unfortunately, sending the email to her husband and the change in the letter on the dates all reflects a very understandable concern that she had. She wanted to help her husband. He had been out of work. But by the same token, she knew when he was working for Nomadic that he was a commissioned salesman. She also knew that the only place that he worked for Nomadic was at the same BPA site where she was working. So in terms of her knowledge of precisely what was going on, yes, there was ample evidence before the jury to draw that inference. Could I ask you, what in your view is the difference, if we could move on to the mail fraud count or wire fraud count, what is the difference? Did you automatically win on the wire fraud count provided the email was in furtherance of the fraud just by showing the same thing as under the conflict of interest statute? I think there is a good deal of overlap. And that's because the wire fraud is really premised upon a scheme to defraud, which really begins with her efforts at getting her husband a job with Nomadic, asking Mark Reynolds to serve as a referral or a recommendation for her husband. It also includes, for example, the fact that she rewarded those people who work for BPA.  I mean, is it just simply a pure, is it simply a conflict of interest statute in this context? Well, at least for the wire fraud purposes, what we showed was that she was depriving BPA of its right to her honest services, that BPA was entitled to have an employee who was a very high-level GS-15 employee that they trusted. And I think part of the reason why, as the concern that was raised earlier about, gosh, weren't they setting her up for this, is that she was in a very high-level, highly trusted position. But if she deprived them of her honest and faithful service, if she discloses to them the fact that she has this conflict? Well, disclosure is just the first part of it. You disclose to the other concern. So you disclose to your employer, if you disclose to your employer, I have this conflict, I just want you to know. And he says, well, okay, now I know you have this conflict. I'll weigh your advice in light of my knowledge of the conflict. Well, except what Vice President Chuck Meyer testified to is that, okay, you've disclosed the conflict, now keep away from it. You're not supposed to be making recommendations. You're not supposed to be taking actions against employees like Amy Clark, who wrote an email critical of her husband. And then it was the defendant, Jane Selby, who wrote the letter of reprimand that she then gave to Mark Reynolds, who signed it. She's not supposed to be doing that. When Tara X. Who's defrauded? I'm sorry? Who is defrauded? BPA. BPA. How? They were deprived of its right to her honest service, to be working on their behalf instead of her husband's interest. I guess I have the same question that Judge Corman has. If BPA, if her superiors know there's a relationship, let's take your law clerk example. I know of a judge some years ago who remained unnamed who had a law clerk who disclosed a conflict, and the judge said, that's fine, I'm making the decisions, you're not, keep working. Well, would you say that by continuing to work, the law clerk deprived the government of his honest services? No. Well, there you've got one judge and one law clerk. And if the judge knows what the problem is and decides that he or she is not going to be influenced in any way by that, then I think that's up to that particular judge. Here, BPA is a large organization, and the people in charge relied upon Jane Selby. The terms of the letter from the ethics advisor was, you are not to participate. But I've seen no sign that BPA didn't get something it was supposed to have gotten or gave up something it wouldn't have given up otherwise, that there was any impact adverse to BPA from the existence of the conflict. I understand the violation of the conflict statute. It's the fraud that kind of wrinkles my brow. And I understand the honest services provision, but ordinarily, if you're defrauded, you lose something. And there's been no loss that's identified to BPA. If her job was to manage the transition to this new technology, that's what she was continuing to do. And there hasn't been anything that says this really wasn't a good deal for BPA. So where's the fraud? And that loss element, it's not an element of the offense. We don't have to prove that BPA spent more money than it should have. So what's the deprivation? You say deprive of honest services, but there's no deprivation if her job entails working with this new technology. They're working with the new technology. She probably shouldn't have done it. No question she shouldn't have done it because of the conflict of interest statute. But I'm still having trouble figuring out where the fraud is. And you've got a conviction for wire fraud, so. Well, the wire fraud, it requires a scheme to defraud. It requires specific intent, and it requires the use of the wires. So where's the scheme to defraud? Where's the fraud part? I mean, defraud has the word fraud in it someplace. So it's not the same as dishonesty. I can be dishonest without violating a fraud statute. Where is the loss to BPA? And you can tell me loss of honest services except that her job entailed what she was doing. There's been no indication that she would have performed differently because she or that she did perform differently because of this conflict. There's no indication that I've seen that suggests that she got off track in some fashion or BPA lost out. Now, I'm not the jury, and I'm not suggesting that you need to persuade me like you have to persuade the jury. But at least someone ought to be able to identify what the loss or fraud to BPA is, and I'm still looking for it. Well, again, this is not a Ponzi scheme. BPA, I can't point to any out-of-pocket loss. What I can point to, though, is the fact that BPA was entitled to rely upon her. And what she did while BPA was attempting to rely upon her was she set up her husband with the job. She was rewarding those who were in favor of nomadic products, and she was taking retribution against those employees who opposed the continued use of ASCII. She was promoting nomadic despite the fact that she had the conflict, and she was pushing this product on Lori Hoffman and the scheduling department when they kept saying, no, we really want to shift our focus to ETMS. In acting contrary to what she was supposed to be doing with that conflict letter, she was depriving BPA of its right to her honest, conflict-free services. That's the loss. Does it make any difference under 1543 that the statutory language reads whoever having devised or intending to devise any scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses? I think, again, we've got sufficient evidence in the record that the jury could have inferred that that was precisely what she did here through this whole course of conduct. Would she have had a defense that my services, notwithstanding the conflict I gave, my advice here would have been the same, and I would have done exactly the same thing whether my husband worked for Nomadic or not? Would she have had a defense? Possibly. I think the problem, though, is that the jury did not believe her testimony. She also testified that Kesh McVeigh, the first BPA ethics attorney that she consulted, told her that it was fine for her to engage in issues regarding implementation. And yet if you take a look at the record, and this is at 208 and 209, and that's the note of the OIG interview, you will see there that the investigator asked Mrs. Selby, so, you know, what did you do? And he stated it in the broadest terms possible when he was asking her what she did. He asked, during the period of June 12, 2002, there's the incorrect date, to the present, did you make any decisions, recommendations, or suggestions, either formal or informal, related to the use of the Nomadic software product? And her answer was no, nothing. Yet at trial, she testified that, in fact, she did engage in implementation issues. She's agreed today that she was advocating for the use of the ASCII product, and yet she told the OIG investigator that she did absolutely nothing. So I think the jury was entitled to disbelieve and disregard either that portion of her testimony or all of her testimony. So if she arguably would have had a defense saying, look, I gave honest and faithful service, the fact that I have a conflict, it may be a conflict of interest, but I gave my best advice, if she had that defense, then wouldn't that distinguish the why of fraud from the conflict of interest? In other words, the conflict of interest is a kind of strict liability. You shouldn't participate in any matter in which your spouse had a financial interest, and we don't want to get involved in a discussion about whether it affected your judgment or not. Right, yeah. So that's why I asked whether there was a difference between that and the why of fraud, because the why of fraud speaks of depriving the government, a scheme to deprive of honest and faithful service. Would she have a defense, or would the government have to prove somehow that the service that she rendered wasn't honest and faithful, notwithstanding the conflict? I think that's accurate. I think the defense to 208 was that she claimed that she did not participate substantially or materially. And the defense to the why of fraud was, well, A, I didn't really do anything, and B, I didn't deprive BPA of anything. And I think the testimony that we provided, Bob Gable testified that, in fact, she did advocate for the $2.7 million settlement of the invoices, despite being told by the FCC. I understand that, but I'm trying to – what I want to try and determine and what I've been trying to determine is that I don't, at least intuitively, don't see the why of fraud being the same as the conflict of interest. I don't necessarily deprive my employer of my honest and faithful service simply because I may have a conflict of interest. I could overcome it. In fact, in various contexts, a client can waive a conflict of interest because he could determine that I still want – I still have confidence that my lawyer will represent me honestly and faithfully. So if there is a defense where the government has to prove – we don't have to get to that one way or another – that notwithstanding the conflict, it was her intent to give honest and faithful service, that she could put the conflict aside. That would be – wouldn't that provide a basis, a reasonable basis to distinguish those two statutes? I think that would be a viable defense. I don't think that's what – and I think that's consistent with her testimony, but that's precisely what the jury rejected. I think they found that she did not, in fact, provide her employer with honest services. BPA never waived the conflict. In fact, they insisted that she comply with the conflict of interest statute in not participating, and then she nevertheless did participate. And she did so in such a way that did, in fact, deprive BPA of what it expected from its employees, the going after other employees, the retribution, the pushing the deal for the $2.7 million that ultimately resulted in a $1.1 million settlement and $10,000 to her husband. That's not honest services. Unless there are any further questions. Could I ask you about the last count? Oh, yes, the false statement count. Yeah. I was having trouble exactly seeing the materiality of that difference between, I guess, he started working on April 1st, so she said June. How is that material given the purpose for which this document was being submitted? It was material for at least three reasons. The first is why was this document being submitted? The document was being submitted because her job title was changing and because her husband, Scott Selby, had left. So she needed to update the original recusal letter and she needed to provide a new recusal letter for her new role as the operations manager. So why was the date material given the purpose for which this document was being submitted? I can understand the argument you've been making if there was an investigation and she was asked to fill out her questionnaires providing this information and she deliberately lied because it would be designed to minimize the degree of her, of the period when there was a conflict. But given the purpose for which this document was submitted, I don't quite understand how the false statement was material to anything. I mean, who was going to base any decision on that particular misstatement? And that was material for at least three reasons. Okay. The first is that letter went to Jerry Crear, who is BPA's ethics attorney. And Jerry Crear was charged with the responsibility of determining, okay, from this day forward, what can she work on given the scope of what was in conflict? From this day forward, what does that matter, whether he started two months earlier or later? It matters because all of these contracts were interconnected. And the whole ASCII project itself, the big contract for the license, was actually signed on March 29th of 2002 by Mark Reynolds. Now, it was on March 20th. But he started working, or they say her husband started working on April 1st. But I still don't understand if this relates to, at the time she makes this, fills out this form, you say her husband had already left, and this deals with what she could do going forward. And I don't understand why it's material when he started for the purpose for which this document was being submitted. Okay. That's because in part, in January of 2003 when she is submitting this letter, the invoice dispute is ongoing. And that invoice dispute involves services her husband provided. There's an invoice dispute going on, but is anybody going to rely on this document in that dispute? The OIG investigator did. He did, but did she have an understanding that that was what was going to happen? I mean, did she understand at all that this document was going to be used in the investigation? There was certainly sufficient evidence in the record that the jury could have inferred that she did. And that's because she knew there was a big fight going on about this $2.7 million invoice. BPA did not want to pay it, and Nomadic was making phone calls saying, we want you to pay. Why did it matter for that purpose whether her husband started on April 1st, which is after the contract was signed, by the way, as I understand it, and June? What difference did it make to that dispute? It made a difference to the ethics attorney. She so testified at SER 621. It made a difference to the OIG investigator, and it was part and parcel of that ongoing invoice dispute. It was directly relevant. I don't understand that. It was directly relevant when she, when her husband started. I don't see how it was relevant. I mean, maybe I'm missing something. Well, for example, if the OIG investigator had included that time period from when Scott Selby actually accepted the job on March 20th, if she had answered that question honestly, she would have had to have told him that, in fact, she asked Mark Reynolds to ask as a referral, that she was promoting him to Burt Buser, that she was the one who orchestrated getting him hired for that job, so that the conflict existed throughout the term of that ASCII project, and that would influence how BPA handled that invoice dispute and whether or not they were going to settle it, whether or not they were going to continue to fight. All of that was material to what they were going to do with that invoice dispute, pay it or fight it. But that's not the reason this document was prepared. The document was prepared, as you told us, with respect to providing notice and to what you could do going forward. I mean, that's the problem that I have with this. Okay, I'm in. Let me ask you a practical question. The sentence imposed here was five years' probation. I assume it was concurrent as to each count. That's correct. So even if we were to overturn one of these counts of conviction, that wouldn't make any practical difference to the sentence that she received? That's correct. Does the government make a recommendation for sentences? Special assessment is what proves that's the current sentence. I'm sorry. Did the government propose a sentence? We did. I believe it was 30 months. Okay. 18 to 24. I guess I could dig into the record and find out, but did the judge make any comments to explain why she sentenced to probation rather than a jail time? I believe she looked at all of the 3553A factors and applied law and the advisory sentencing. It's nice to have a criminal appeal that doesn't involve sentencing issues. I don't want to open the door. Well, now that you mention it. The government just made a point to me, a sidebar here that I hadn't thought of. Did the court impose a special assessment as to each count of conviction? I assume it did. Yeah, $100 per count. That's correct. So did that, too, might suggest that all this is very interesting, but it's purely academic because of the concurrent sentence? Well, I mean, it would certainly affect it. If for some reason you were to reverse on one of the counts, then the district court would have to amend the judgment to reflect only those counts of conviction, and it would have to remove at least one of the $100 special assessments. Do you care about the $100 special assessment? Deeply. Thank you, Your Honor. I liked that case hearing yesterday afternoon. If I may just pick up on that factual matter that counsel just talked about with regard to the materiality. She mentioned that the OIG investigator actually relied upon this document, and I think she's relying upon the statement that Ms. Selby made in response to a question. The question was, on June 11, 2002, you signed a conflict of interest memorandum, and it goes on to describe what that memorandum says. So the question was framed not in the terms of, you know, we assume or you're telling us the truth that your husband started in June of 2002. He's referring to the date that the first conflict of interest memorandum was signed. So in actuality, there was no reliance by the OIG investigator upon this date. But if the question before the agency is do I have an employee who suffers from a conflict of interest, why isn't it material to know that the conflict arises because of the employment of the spouse with a vendor to BPA, which is currently involved in a substantial $2.7 million dispute over unpaid employment, and to know that the spouse will be receiving a cash commission depending upon the amount that is ultimately taken, wouldn't it be material to know the date of employment because it might affect the amount of the spouse's commission? Well, certainly not in this case because the commission that we're talking about didn't come along until late August of 2002, which was after the date that she inaccurately represented. Let me ask the question in a different way. If for whatever reason Mr. Selby had not been a commissioned salesman, he had simply been an employee of Nomadic and there was a dispute between Nomadic and BPA over $2.7 million, would that have been a material difference? You mean and then she fails to disclose that he was an employee of this company? I think it does make a difference, at least in my mind, to know what the period of service of the commissioned salesman was where he's going to get a piece of whatever money BPA ultimately pays to the employer and that's influenced by how long the salesman worked. But the purpose of this recusal letter had nothing to do with his receipt of commissions except with regard to... What is the financial motive for the conflict, if I understand the government's theory here? That this is more than just trying to help your husband do well in the eyes of his employer. If the husband's actually getting a cut of the government business that's being given to Nomadic, that's a pretty powerful motive to engage in a conflict of interest by federal employees. And I would think that the agency would want to know what the relevant period of the husband's employment was for the commissioned salesman. But I think the essence of what you just disclosed as being what they would want to know was in fact disclosed in that warrant, that there was a conflict of interest. Except that there was a lie, if I take your verdict, as opposed to an innocent misrecollection on date. She lied about the date of his employment in the middle of an OIG investigation. Why doesn't that constitute a 1001 violation? Well, there's a difference between materiality and motivation. I mean, the materiality question in isolation, just talking about that particular element, or other elements, the materiality element goes to what was BPA's intention in gathering this information. What was the issue at hand? What was the question at hand in preparing this document and making a decision? The only decision to be made or the only issue at hand at the time that she signed that second recusal letter was what is the scope of her activities going forward? In light of the fact that there was this ongoing dispute about this. Except the jury's verdict and the government's theory, the scope of her activities included influencing the agency's decision to procure additional work from Nomadica, which her husband got a commission. Procuring additional work? Well, no, I mean, the letter stated she couldn't be involved in anything having to do with that. Well, let's assume for the sake of my hypothetical question that the jury doesn't believe her protestations that she wasn't involved, that she actually did influence the decision to place that extra work with Nomadica. Doesn't that then drive the determination as to whether or not the misstatement was material? Your Honor, again, all I can say, I think, is that, again, the fact that whether her husband started on April 1st or June 1st has no bearing on that issue that I can see. Well, the whole problem arises from the fact that her husband worked for the vendor. We wouldn't be here if he had never gone to work for Nomadica. So why isn't the date that he was employed by Nomadica relevant and important to BPA determining whether or not it's got an employee who suffers from a conflict of interest when it's got an ongoing dispute with the vendor over money that the husband is paying? Really, Your Honor, the issue wasn't whether she suffered an ongoing I mean, there was no dispute that there was a conflict as to this commission as of January of 2003. There was no dispute about that. She did, and she acknowledged that and said that she couldn't be involved in that discussion. And there was also no dispute about whether going forward she can be involved in new work where her husband wouldn't receive any sort of commission. There was no dispute about that. She ultimately left Nomadica because she wasn't comfortable with it. That's right, because she had taken on this new role. Okay. Thank you very much. Yes, very well argued. The case to target is submitted and we will be adjourned.
judges: Tallman, Clifton, Korman